**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00413 (EGS)** |
| **v.** | : | |
| | : | |
| **PHILIP EDWARD KRAMER,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Philip Edward Kramer to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

I.      **Introduction**

The defendant, Philip Edward Kramer ("Kramer"), 62, a former truck driver from Southern California, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million dollars' in losses.[1]

On December 9, 2021, Kramer pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol exceeded $2.7 million dollars.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a sentence of 30 days' incarceration is appropriate in this case because: (1) he expected to meet violence in Washington, D.C. and, consistent with that expectation, brought a helmet, a strap with a master lock attached to it, and a cane to the Capitol; (2) while on the grounds of the Capitol building and prior to entering the building, he saw a "Do Not Enter" sign, approximately two feet in length, that had been posted on the fencing by the federal government, and stole it because he wanted it as a "souvenir;" (3) he saw a crowd physically confronting officers of the United States Capitol Police ("USCP") on the west front of the Capitol and filmed the interaction with his cell phone; (4) he penetrated the Capitol through the North Doors and traveled inside the Brumidi Corridor; (5) he remained inside the Capitol until he and other rioters were forced to leave when police officers began spraying the crowd with pepper-spray; and (6) after January 6, he destroyed evidence by throwing out the "Do Not Enter" sign because he became scared of being caught with it.

The Court must also consider that Kramer's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. Here, the combination of Kramer's preparation for violence on January 6, participation in a riot that actually succeeded in halting the Congressional certification, theft of government property, and destruction of evidence renders the recommended sentence both necessary and appropriate in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 19 (Statement of Offense), at 1-7. In doing so, however, the government in no way intends or wishes to deemphasize the importance of acknowledging that each participant in a riot is part of that riot. As Judge Chutkan recognized, "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 21-CR-54 (TSC), ECF No. 32, p. 25. Judge Lamberth similarly wrote,

> Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2. From the most mundane actions to the most violent, each rioter, including Kramer, contributed directly and indirectly to the violence and destruction of that day.

*Kramer's Role in the January 6, 2021 Attack on the Capitol*

On or about January 5, 2021, Kramer traveled from Ontario, California to the Washington, D.C. area to attend former President Trump's "Stop the Steal" rally that was scheduled to take place at the Ellipse in Washington, D.C. on January 6. Kramer contemplated and prepared for violence on that day by bringing a helmet and cane with him from California.  He purchased a carpet knife, Master Lock, rubber gloves and medical supplies from stores in Virginia. He carried all of these items with him on January 6, except for the knife. Presentence Report ("PSR") ¶¶ 21, 29.

3

As Kramer described in pre-arrest interviews and conversations with Federal Bureau of Investigation ("FBI") agents, after attending former President Trump's rally on January 6, he walked eastward with many others to the Capitol. As he entered the grounds of the Capitol, he observed a crowd confronting USCP officers on the west lawn. Image 1 is a map of some of the restricted area of the Capitol on January 6, 2021. The west lawn is encircled.

Image 1



As Kramer entered a part of the restricted area of the Capitol grounds, he observed someone cutting a USCP "Do Not Enter" sign from a fence on the west lawn. Rather than adhering to the approximately two-foot long sign's instruction, Kramer stole it and later brought it back to California as a souvenir. He informed the FBI that he destroyed the sign because he became scared of what could happen if he were found with it, PSR ¶¶ 23, 28, but not because he realized it was wrong.

4

Kramer used his cell phone to record the crowd and their interactions with police. He walked from the west and northwest lawns to the north side of the Capitol, looking for a point of entry, all the while filming the raucous crowd surrounding both sides.

When he was interviewed by FBI agents on March 26, 2021, Kramer traced the route that he took to reach the Capitol on an aerial view of the Capitol area, as shown in Image 2. The red line shows the route that Kramer took to the Capitol. The circled "S" marks the spot where he observed an individual cutting the USCP's "Do Not Enter" sign that he stole. The circled "X" marks the spot where he observed a group pushing on fencing against a line of police officers.

Image 2



The Senate Wing at the north end of the U.S. Capitol was the first place where rioters breached windows and doors and made their way into the interior of the Capitol when Dominic Pezzola broke a window adjacent to the Northwest Door via the portico in the Northwest Courtyard. Afterward, the North Doors became a key target for those attempting to get inside the Capitol later in the day.[2] See Image 3.

Image 3



When he was interviewed by the FBI on March 19, 2021, Kramer insinuated that he was unwillingly pushed inside the Capitol when the crowd he was in surged toward the doors of the building. PSR ¶ 22, 28. That does not square with his admissions to agents that he was looking for a point of entry because he intended to go to the Senate Gallery and watch the certification proceedings.  Kramer also admitted to the agents that he knew the Capitol and its grounds were restricted and the building was not open to the public on January 6. PSR ¶¶ 22, 26, 28. He did not assert that police officers allowed or welcomed him into the Capitol.

---

[2]  https://docs.google.com/document/d/1hxXJrKhtDyf-1anm6g-wgp9DNNiy0dJp4KJKiNlXyAU/edit#.

A surveillance camera located near the North Doors of the Capitol and pointing in the direction of the Brumidi Corridor captured a crowd of rioters, including Kramer, that entered the Capitol at approximately 3:10 p.m. *See* Video Exhibit 1. Images 4 through 6 are screenshots taken from the surveillance video of Kramer, dressed in a red "USA" hat, red jacket, gray backpack, and carrying a tall cane, flag and cell phone, at approximately 3:10 p.m. In Images 5 and 6, Kramer was holding his cell phone overhead to record the activities taking place around him.

Images 4 and 5



Image 6



At approximately 3:11 p.m., police officers formed a line in the Brumidi Corridor and began to spray rioters, including Kramer, with Oleoresint Capsicum ("OC") spray to deter their movement further into the Capitol. The officers systematically pushed the crowd that Kramer was among toward the exit doors. *See* Image 7.

Image 7



Kramer left the Capitol building at approximately 3:12 p.m. and did not re-enter. In total, he spent less than five minutes inside of the Capitol and, because of the police officers' actions, he did not proceed into the Capitol beyond the Brumidi Corridor.

*Kramer's Interviews*

Kramer voluntarily agreed to two in-person interviews with FBI agents prior to his arrest. During each interview, he admitted that he entered onto the grounds of the Capitol and into the building, stole the sign, and carried a helmet, a strap with a lock attached to it, and a cane, which he intended to use to defend himself if he was involved in an altercation.

According to Kramer, after he returned to California, he got rid of the sign out of fear of what could happen to him. He stated that his phone fell into the ocean while he was at work at the dock in San Pedro, California and was lost; the agents found a text that Kramer wrote prior to their first interview with him, in which Kramer texted a friend and stated that he lost his phone. He claimed that he did not save any of the photographs or videos that he made on January 6 to "the Cloud." He also stated that he did not post any of the photographs and videos on any social media sites and federal agents did not locate any on Kramer's social media sites.

In March 2021, a few days after his second meeting with FBI agents, Kramer sent a text to one of the agents he had met and stated, "I am still trying to locate a video and picture from that day [January 6] for you." Kramer never produced any photos or videos to the government. Kramer provided his new cell phone to agents and they were unable to identify any photos or videos made by Kramer on January 6 on it.

At every meeting with the FBI, Kramer expressed his regret for going to Washington, D.C., stealing the sign, and entering the Capitol.

*The Charges and Plea Agreement*

On April 7, 2021, Kramer was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), 641, and 40 U.S.C. §§ 5104(e)(2). On April 14, 2021, he voluntarily appeared in the district court in the Central District of California. On June 21, 2021, Kramer was charged in a five-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), 641, and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 9, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Kramer agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Kramer now faces sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment, a fine of not more than $5,000, and a $10 special assessment. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at a defendant's individual conduct, this Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are

not exhaustive nor dispositive, they help to place each defendant on a spectrum of aggravating and mitigating circumstances that should inform the decision about their fair and just punishment.

To be clear, had Kramer personally engaged in violence, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent acts on his part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Kramer from most other misdemeanor defendants.  Kramer's lack of violence and his theft and later destruction of property valued at less than $1,000[3] are the only reasons he was charged only with, and permitted to plead guilty to, a misdemeanor rather than any felony.

Kramer was prepared for violence when he traveled to Washington, D.C. He brought a helmet and cane with him from California.  From stores in Virginia, he purchased a Master Lock that he attached to a strap that he could swing at his opponent. He also purchased rubber gloves, medical supplies and a knife.  Although he did not bring the knife with him to the Capitol on January 6, his actions demonstrated a substantial amount of preparation for violence.

As Kramer approached the Capitol, USCP declared at 1:49 p.m. that a riot was underway at the Capitol.  Kramer admitted that as he approached the Capitol he saw fencing had been torn down and someone cutting the "Do Not Enter" sign from the fencing. He also saw individuals confronting police officers; in response, Kramer started recording what he saw on his cell phone. Undoubtedly, he would have seen and also heard the chants of rioters on the west front of the Capitol building.

The combination of the theft and destruction of government property and seeing individuals confronting police officers on the west front of the Capitol were red flags that should

---

[3]  A representative of the Architect of the Capitol estimated that the "Do Not Enter" sign had a value of less than $1,000.

have told him to stop proceeding to the Capitol with other rioters. But he did it anyway and proceeded into the building that was completely surrounded by rioters and breached, because he wanted to and had his own agenda.  Moreover, Kramer's time in the Capitol was limited to only a few minutes because the crowd he was in were being sprayed by police officers and forced to leave the building.

Accordingly, the nature and the circumstances of this offense render the government's proposed sentence sufficient but not greater than necessary to reflect the seriousness of the instant offense, to promote deterrence, to protect the public from future crimes that may be committed by Kramer, and to avoid unwarranted disparity.

### B.  Kramer's History and Characteristics

As set forth in the PSR, Kramer has no criminal history and he has been compliant with his conditions of pre-trial release. At the time of the offense, Kramer was employed as a truck driver who specialized in the transport and off-loading of petroleum products. His Transportation Worker Identification Credential ("TWIC") and hazardous material credentials and license were revoked because of the charged offense. PSR ¶ 73. He has been unemployed since mid-2021.

Kramer's compliance with all of the conditions of his pretrial release since he was arrested and his financial dependence on his wife were considered by the government in its sentencing recommendation.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Kramer knew what he was doing was wrong on January 6, yet he did it anyway. As discussed above, Kramer's behavior while on the restricted grounds of the Capitol and while inside, as well as the fact that he wanted to memorialize it by recording confrontations with police officers and still decided to go inside the Capitol on January 6 is significant. Since being approached by federal agents, Kramer has shown contrition and remorse. For these reasons, the government submits that the recommended sentence is sufficient, but not greater than necessary to achieve the goal of specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth). *See also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Kramer has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating and picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, and other considerations.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir.

2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, given the aggravating factors in this case, the Court may consider the sentences imposed in similar misdemeanor cases where the defendants pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G):

In *United States v. Nicholas J. Perretta and Mitchell Paul Vukich*, the defendants breached the U.S. Capitol after witnessing assaults on law enforcement, traveled all the way to the 3rd floor of the Capitol building where few other rioters ventured and many staff offices are located, and stole paperwork that was on the floor of a hallway. The Court sentenced both defendants to 30 days' imprisonment. 21-cr-539 (TSC).

In the case of *United States v. Paul Westover,* the defendant was accompanied by William Merry and Emily Hernandez, all of whom were aware that police officers were trying to disperse

the crowd that assembled outside the Capitol and witnessed a rioter forcibly remove a bike barricade. Undeterred, Westover, Merry and Hernandez surged toward the Capitol and stormed past a group of police officers to enter the building. Once inside, they went to the Speaker's suite. Merry encouraged Hernandez to pick up a shard of Speaker Pelosi's office sign, which had just been smashed by another rioter, and she did. Later, Merry and Hernandez proudly displayed the stolen shard on Capitol grounds. Hernandez also stole other items from the Capitol and Capitol grounds, including a "Keep Off Fence" sign and a "Please Do Not Touch" sign from the foot of a statue in the Capitol. Westover celebrated the theft of the government property by his companions. He also destroyed evidence by deleting photos and videos that he recorded on January 6 from his cell phone and Facebook account. The Court sentenced Westover to 45 days incarceration. 21-cr-697 (JEB).[7]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

---

[7] William Merry pleaded guilty to one count of violating 18 U.S.C. § 641, Theft of Government Property. He was sentenced to 45 days' imprisonment. 21-cr-748. Emily Hernandez pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1) and was sentenced to 30 days' imprisonment. 21-cr-747 (JEB).

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.      The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.   *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

court may impose a term of continuous incarceration that exceeds two weeks[8] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[9] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this

---

[8] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

[9] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in*

*conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a

prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Kramer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1.  Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of

imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[10]

## A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of

---

[10] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[11]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in Kramer's case given the requested 30-day imprisonment sentence.

## VI.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Kramer to 30 days' incarceration, followed by three years' probation. He should also be ordered to pay $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while

---

[11] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:     */s/ ANITA EVE*
        ANITA EVE
        PA Bar No. 45519
        Assistant United States Attorney (Detailee)
        U.S. Attorney's Office
        555 4th Street, N.W., Room 5840
        Washington, D.C.  20530
        Anita.eve@usdoj.gov
        (215) 764-2177