**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:21-CR-00413-EGS |
| v. | |
| PHILIP EDWARD KRAMER | |
| Defendant. | |

**DEFENSE SENTENCING MEMORANDUM**

Defendant Philip Edward Kramer, by and through his attorney of record, Deputy Federal Public Defender Jonathan K. Ogata hereby files a memorandum setting forth his position regarding sentencing. For the reason outlined below, Mr. Kramer respectfully requests the Court impose a sentence of 12 months' probation or 30 days home detention—a sentence sufficient, but not greater than necessary, to achieve the purpose of sentencing in this case.

## I.  INTRODUCTION

Before the Court is Mr. Philip Edward Kramer, a 62-year-old father, husband, and son. Prior to the events of January 6, 2020, Mr. Kramer lived, by all accounts a law-abiding life, with no criminal history—not even a traffic violation. PSR at 9-10. For Mr. Kramer, January 6, 2020, stands as a stark outlier in his life, a stain on an otherwise clean record, and a mistake that he will regret for the rest of his life. PSR at 9.

It goes without question that the events that transpired on January 6, 2020, were far outside the boundaries of acceptable conduct, damage and harm befell the capitol and those entrusted to protect it. Mr. Kramer understands this and accepts responsibility for his conduct on that day— including the taking of a small sign and his entering the capitol for two minutes. Gov Sentencing Memo. At 7-9. His conduct was unacceptable, and he accepts responsibility for it, but it was not

violent, not destructive—he broke no windows, no doors, entered no rooms or offices—and not long in time.

As discussed in detail below, Mr. Kramer's conduct, background, lack of criminal history, acceptance of responsibility, cooperation with law enforcement, and life circumstances support a sentence of 12 months' probation or 30 days home detention.

## II.  LEGAL STANDARD FOR SENTENCING

The Supreme Court has consistently held that federal judges should impose sentences that are not greater than necessary to satisfy the statutory purposes of sentencing, consider all the characteristics of the offender and circumstances of the offense, reject advisory guidelines that are not based on national sentencing data and empirical research, and serve their function in the constructive evolution of responsible guidelines. *See U.S. v. Booker*, 543 U.S. 220 (2005); *Rita v. U.S.*, 127 S. Ct. 2456 (2007); Gall v. U.S., 128 S. Ct. 586 (2007); *Kimbrough v. U.S.*, 128 S. Ct. 558 (2007); *Spears v. U.S.*, 129 S. Ct. 840 (2009); *Nelson v. U.S.*, 129 S. Ct. 890 (2009).

The applicable sentencing statutes provide that a sentencing court "shall impose a sentence sufficient, but not greater than necessary" to achieve the objectives of sentencing. *See* 18 U.S.C. §§ 3553(a), 3582(a), and 3661. In arriving at the appropriate sentence, § 3553(a) directs sentencing courts to consider: (1) the nature and circumstances of the offense; (2) the history and characteristics of the offender; (3) the need to impose a punishment that reflects the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (4) to afford adequate deterrence; (5) to protect the public from further crimes; (6) to provide the defendant with needed education, vocational training, medical care or other correctional treatment; (7) the kinds of sentences that are available; and (8) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(1), (2), (3), (4), (6).

## III.  PURSUANT TO 18 U.S.C § 3553(a) THIS COURT SHOULD IMPOSE A SENTENCE OF 12 MONTHS PROBATION OR 30 DAYS HOME DETENTION.

### A.        History and Characteristics of Mr. Kramer.

Mr. Kramer is a lifelong resident of Orange County, California.  He was born in Fullerton, California, and raised a short distance away in Garden Grove, California.  PSR at ¶ 42.  Mr. Kramer grew up with three brothers, one of whom is his twin.  PSR at ¶ 42-43.  Mr. Kramer recalls a happy childhood with loving parents and a supportive family.  *Id*. at ¶ 44.  In June of 1980, Mr. Kramer married the love of his life, Ms. Michelle Kramer.  *Id*. at ¶ 45.  Mr. and Mrs. Kramer have two children, both adults now, successful in their own right.  *Id*.

From September 1995 until shortly after the genesis of this case, June 2021, Mr. Kramer was employed as a tanker driver tasked with refueling large ships.  PSR at ¶ 73.  This is highly specialized work requiring precision and great responsibility.  As a tanker driver Mr. Kramer pumps gallon of diesel fuel and oil over the open water into docked ships.  *Id*.  He is one of only thirty local drivers able to accomplish this work.  *Id*.  Though the work is arduous, demanding, and highly specialized, Mr. Kramer has enjoyed it.  He takes great pride in his ability to work in this trade, to support himself, his family, and to be a productive member of society at large.

Unfortunately, after this case was filed TSA revoked two licenses necessary for Mr. Kramer to accomplish his duties as a tanker driver, his TWIC and Hazmat licenses.  *Id*.  Though his company tried to keep him on as long as they could, in June of 2021, Mr. Kramer had to separate from the company as he was unable to complete his duties.  *Id*.  Mr. Kramer has been unemployed ever since, relying on state unemployment and the income from his wife's work to support the family.

In his 62 years of life Mr. Kramer has never been in trouble with the law—never been charged with a crime or even cited for a traffic violation.  *Id*.  at ¶ 9-10.  By all accounts Mr. Kramer has lived a normal, law-abiding life, defined by hard work, a loving family, and his passions as an athlete.  Indeed, Mr. Kramer has been an avid athlete his entire life, working hard

to excel in water skiing, running, cycling, and soccer. *Id.* at ¶ 70. In 2003, Mr. Kramer went to the World Championships for water skiing and placed second—a accomplishment that he humbly recounts with pride. *Id.*

Mr. Kramer appears before the Court as the hardworking family man he is, someone who loves his wife and cherishes his kids, who has spent his life working hard to contribute to the family, and someone who made a terrible mistake on January 6, 2020. Mr. Kramer has readily accepted responsibility for his actions that day and stands here forever changed by those actions. Since that date Mr. Kramer has endured the consequences of his conduct, being arrested by the FBI, strip searched and processed through the Santa Ana jail, he has lived with an ankle monitor secured to his body, read, listened to, and watched stories of his conduct discussed in the news and media, lost his job of almost 30 years, and dealt with the perpetual and seemingly endless emotional and physical toll these consequences have caused and continue to cause.[1]

If the Court is to look at Mr. Kramer's character, at his history and the characteristics that define him as a person, the Court should look at the vast majority of his life, the 61 years before January 6, 2020, not just his regretful actions on that day. Though it is unquestionable that entering the Capitol on January 6, 2020, is now a part of Mr. Kramer's history, a stain on an otherwise clean record, it need not and should not be the defining characteristic of who he is as a person. His actions on January 6, 2020—entering the Capitol for a couple of minutes, taking a small sign—should not wash away a lifetime spent as an otherwise law-abiding person.

An important component of his case, which demonstrates who Mr. Kramer is a as a person, is the degree to which he cooperated with the FBI, the speed with which he accepted responsibility, and how well he has done on pretrial release. Mr. Kramer willingly and without the presence of counsel agreed to meet with the FBI on not one, but two occasions, March 19, 2021, and March 26, 2021. PSR at ¶¶ 28-29. During those surreptitiously recorded interviews Mr. Kramer readily

---

[1] A document outlining Mr. Kramer's medical conditions is filed separately under seal as Exhibit A. This document further supports the defense position for 12 months' probation or 30 days home detention.

answers questions and cooperated with the agents.  He was respectful and deferential, showing regret for his actions.  Further, since being placed on pretrial release Mr. Kramer has complied with all conditions and obligations of his release, always showing his pretrial officer respect.  This conduct, this is a window into who Mr. Kramer is, a person who respects others, who cooperates and admits his wrongdoing, who does not seek to hide or evade the consequences of his actions, but actively works to remedy his wrongs and accept the consequences that follow.

A sentence of 12 months' probation or 30 days home detention is reasonable and appropriate in this case based on Mr. Kramer's history and characteristics.

**B.    The Nature and Circumstances of the Offense.**

Mr. Kramer regrets taking the sign, he regrets going into the Capitol, he regrets ever going to Washington D.C. on January 6, 2020.  "If he could do the whole day…all over, he would stay home and not go to Washington D.C."  PSR at ¶ 31.  The PSR notes that Mr. Kramer had a helmet and a strap with a master lock attached to it in a backpack, along with a walking cane.  *Id*. at ¶ 21.  Critically, the PSR mentions no incidents of violence and the government concedes that Mr. Kramer did not engage in any violent conduct.  PSR and Gov. Sentencing Memo at 12.

The government makes a great deal about the items in Mr. Kramer's backpack, about the walking stick, and about other items purchased by Mr. Kramer when he arrived in Virginia.  Gov. Sentencing Memo at 12.  The government contends "Kramer was prepared for violence when he traveled to Washington, D.C."  *Id*.  But this argument is bellied by Mr. Kramer's actual conduct. It is undisputed that Mr. Kramer had a helmet in his backpack, a first aid kit, and a strap with a lock on it.  It is also uncontested that Mr. Kramer walked with a walking stick on that day.  The government believes these items demonstrate a proactive preparation for violence.  But the opposite is true.  As probation notes in their Sentencing Recommendation, the evidence supports that these items were brought as reactive defensive items.  Probation concludes "[w]hat is supported by the evidence…is that [Mr. Kramer] believed he needed to bring specific items with him to the Stop the Steal Rally and inside the U.S. Capitol because of his prior experience at rallies in California."  ECF No. 23 at 2.  Probation further concludes, "Kramer packed a helmet, a strap

with a master lock attached to it, and a walking cane in the event he needed to defend himself…" *Id.*[2] Mr. Kramer did not come prepared for to engage in violence, he did not come prepared to attach anyone, he only brought items he believed he may need to prevent harm on himself.

If the Court hopes to divine further whether Mr. Kramer envisioned violence happening on January 6, 2020, it need not look far—for we know what Mr. Kramer did that day. Mr. Kramer watched the then President speak. He walked to the Capitol with the items in his backpack, walking stick in hand. He grabbed a small sign and entered the Capitol for a brief two minutes. He did not take out his helmet and put it on, as one would presume someone prepared for violence would do. He did not remove the strap and lock from his backpack. He did not raise his walking stick or swing it around as someone prepared for violence might. He did none of these things. He did what he admitted to doing so many months ago—he took a sign he should not have, and he entered the Capitol when he should not have. He did not go there for violence, he did not engage in violence, and no matter how much the government says otherwise, it will not change those facts.

For this reason, the Court should impose a sentence of 12 months of probation or 30 days home detention, an appropriate sentence based on Mr. Kramer's conduct on January 6, 2020.

## C.     The Need to Impose a Punishment that Reflects the Seriousness of the Offense, to Promote Respect for the Law and to Provide Just Punishment for the Offense.

A sentence of 12 months' probation or 30 days home detention is a meaningful and significant sentence for Mr. Kramer, a person who has no criminal history. This sentence is sufficient to reflect the seriousness of Mr. Kramer's conduct and would provide just punishment for his actions. This sentence will ensure that Mr. Kramer faces proportionate consequences for his actions on January 6, 2020, while promoting respect for the law through just punishment.

---

[2] The PSR, Probation Sentencing Recommendation, and Government Sentencing memo make reference to a carpet knife purchased by Mr. Kramer. This is also referenced in the factual basis of the plea. Importantly, as discussed by Probation, Mr. Kramer did not bring the carpet knife with him to the rally that day nor did he have it when he entered the Capitol. Further, as probation concludes, "Kramer did not make any comments as to the purpose of this Knife and did not bring it with him to the Capitol." Probation Sentencing Recommendation at 2.

The government's argument for 30 days incarceration, plus 36 months of probation, plus 60 hours of community service, is disproportionate and divorced from the facts.  This sentence is overly harsh and runs afoul of the principles of just punishment.  Indeed, this sentence is even far and above what probation has recommended to the court—2 years of probation or 60 days home detention.  ECF No. 23.  Probation specifically notes "a sentence of incarceration does not appear to be needed for specific deterrence in this case to promote respect for the law." *Id.* at 3.  Probation goes on to state "[a] probationary sentence would serve to protect the community and fulfill the goals of deterrence and punishment for [Mr. Kramer]." *Id.*  The defense agrees with probation. The Court should impose either a term of probation, the defense asserts 12 months, or a term of home detention, the defense asserts 30 days.  Such a sentence is in line with the findings of probation and supported by the facts of this case.

### D.    The Need to Avoid Unwarranted Sentence Disparities.

A sentence of 12 months' probation or 30 days home detention would be congruent with cases similar to Mr. Kramer's and would avoid sentencing disparities.  In the Table 1 attached to the government sentencing memorandum it appears there are approximately 114 cases with the same underlying charge, a violation of 40 U.S.C. § 5104(e)(2)(G).  Among those there are four sentences of 12 months of probation and 11 sentences which included a term of 30 days home detention.  This supports a sentence here for either 12 months' probation or 30 days home detention.

The government argues that their proposed sentence of 30 days incarceration, plus 36 months of probation, plus 60 hours of community service, is not disparate from prior sentences. However, their own sentencing table does not support this.  In the 111 cases noted above only 30 have included a sentence of incarceration—meaning only 27% of 5104(e)(2)(G) cases result in a custodial sentence imposed.  To support their argument that Mr. Kramer should be in this low minority of cases resulting in incarceration, the government cites two specific cases (1) *United States v. Nicholas J. Perretta and Mitchell Paul Vukich*, 21-CR-539 (TSC); and (2) *United States*

*v. Paul Westover*, 21-CR-697 (JEB).  Gov. Sentencing Memo at 18-19.  Each case is significantly different with distinguishing aggravating factors.

In *United States v. Nicholas J. Perretta and Mitchell Paul Vukich*, 21-CR-539 (TSC), both defendants pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G) and were sentenced to 30 days incarceration.  However, as outlined in the government's sentencing memorandums these defendants engaged in significantly different conduct than Mr. Kramer.  In this case, the defendants both observed "at least one officer assault" and despite this observation moved to the front of the crowd to enter the Capitol.  21-CR-539 ECF Nos. 47 and 48 at 3-4.  Both defendants remained in the Capitol for about 25 minutes.  *Id*.  While in the Capitol the defendants roamed around multiples hallways, opening cupboards and picking up papers from the floor.  *Id*. at 6-7.  Later in the evening Perretta sent a message about breaking into the capitol stating, "We smoked a blunt in the capital [sic]."  The person responded, "Don't get shot like that bitch" to which the defendant responded, "We easily could've" "we were getting flashbangs thrown at us too." *Id*. at 10.  Vukich sent a series of messages to various individuals stating, among other things "Bro I was in the capitol building I almost got shot" "we were in the thick of it I had my goggles" "Got pepper sprayed and shot with rubber bullets lol."  *Id*. at 11.

This conduct is vastly different in scale, severity, and degree than Mr. Kramer's.  Mr. Kramer took a small sign and entered the Capitol for only two minutes.  Mr. Kramer did not witness this kind of assault on officers, engaged in any violence, open any cupboard, smoke anything in the building, or engage in any similar conduct as the defendants in this case.  This case in fact highlights why Mr. Kramer's sentence should not include a term of imprisonment because his conduct was so vastly different.

In *United States v. Paul Westover*, 21-CR-697 (JEB) the defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 45 days incarceration.  In *Westover*, the defendant witnessed the breach of the barricades at the Capitol, recording it.  21-CR-697 ECF No. 43 at 4.  The defendant then proceeded to step over the dismantled fencing and proceed to the Capitol.  *Id*.  The defendant proceeded up the outer steps of the Capitol, livestreaming his

movements as he made statements about rubber bullets and being on the "front line". *Id*. Once up against the top barricade the defendant witnessed individuals forcibly remove the police barricade and push past the retreating police officers. *Id*. at 5. Following these initial breaches, the defendant then recorded video of officers attempting to disperse the rioters, noting the use of tear gas. *Id*. at 6. The defendant then proceeded through the scaffolding stating, "we're storming the gates of the Capitol here" and shouting, "we're coming, Nancy!" *Id*. The defendant eventually enters the Capitol through the Senate Wing door, making his way to the crypt. *Id*. at 6-7. The defendant then proceeded to the Speaker's Suite, chanting for "Nancy" and watching individuals pry the sign off the Speaker's office suite wall. *Id*. The defendant then made his way to the rotunda making additional statements about "Nancy" before exiting the Capitol by crawling through a broken window nearly 40 minutes after he had entered. *Id*. at 8-10. Additionally, after January 6, 2020, the defendant destroyed evidence by deleting photos and videos from his phone and social media accounts. *Id*. at 43.

This case too is far different than the one presently before the Court. In *Westover* the defendant was among the first in the Capitol, witnessing and participating in the dismantling of barricades, pushing through police lines, crawling through scaffolding, all to enter the Capitol. Once in the Capitol this defendant roamed through the crypt, up to the Speakers conference room where he witnessed and participated in the vandalism of the office before proceeding to the rotunda. Mr. Kramer did nothing similar to this. Mr. Kramer was not among the first wave in, he was not involved in the front-line breaches of the barricades or the pushing back of officers. Mr. Kramer did not witness this level of violence and destruction and certainly did not participate it in the way Mr. Westover did. Mr. Kramer was also in the Capitol for a small fraction of the time Mr. Westover was in, two minutes versus 40 minutes. Despite the government's citation to this case, it does not support a sentence of incarceration, rather it demonstrates why such a sentence would be disproportionate for Mr. Kramer. Mr. Kramer's conduct simply does not rise to the level of those sentenced to terms of incarceration.

Based on a review of similar cases, a sentence of 12 months' probation or 30 days home detention would avoid sentencing disparities and be proportional to Mr. Kramer's conduct. *See United States v. Eliel*, 21-CR-00068 (TNM) (sentenced to 12 months' probation); *United States v. Sizer*, 21-CR-00621 (CRC) (sentenced to 12 months' probation); *United States v. Blauser*, 21-CR-00386 (TNM) (sentenced to pay $500 fine and $500 in restitution); *United States v. Edwards*, 21-CR-00366 (JEB) (sentenced to 12 months' probation).

## IV.  A SPLIT SENTECE IS NOT LAWFUL IN THIS CASE.

The government relies on *United States v. Little*, 21-cr-290 (RBW) as the authority to support its argument for a split sentence in this case.  Reliance on *Little* is misplaced because the Court in *Little* incorrectly determined the lawfulness of a split sentence, relying not on the applicable statutory provisions, but instead on its opinion that "[o]nly a split sentence would adequately serve the goals of sentencing described in 18 U.S.C. § 3553." *Little* Op. at 4–5.  The Court does not have the authority to set the outer bounds of criminal punishment: "the scope of judicial discretion with respect to a sentence is subject to congressional control."  *Mistretta v. United States*, 488 U.S. 361, 364 (1989); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76 (1820); *Ex parte United States*, 242 U.S. 27 (1916).  For the reasons below, this Court should reject *Little*'s faulty interpretation of § 3561(a)(3).

### A.     Section 3561(a) Is Not A "Grant of Authority"—It Is a Limiting Provision.

The court's opinion in Little is premised on its incorrect view of § 3561 as "a grant of authority," with an exception (subsection (a)(3)) and an exception-to-the-exception (the petty-offense clause in subsection (a)(3)).  *Little* Op. at 7–8.  But § 3561(a) does not "largely reiterate[] the same rule found in § 3551," *id*. at 7, or expand the authority granted in § 3551 (which provision is entitled "Authorized sentences").  Instead, as a whole, § 3561(a) further limits the use of probation.  It prohibits probation in three circumstances: probation is not permitted (1) if "the offense is a Class A or Class B felony and the defendant is an individual," (2) if the offense of conviction is one for which the Code expressly excludes probation, or (3) if "the defendant is

sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." The first two of three subsections plainly circumscribe a court's authority to impose a term of probation. Thus, the court's characterization of § 3563(a)(3) as "a grant of authority" "largely reiterat[ing]" § 3551(b)'s general grant of authority is simply inaccurate. Section 3561 sets applicable prohibitions on probation; it does not, as the government and Little suggest, expand the use of probation to create the possibility of a "split sentence" for any and all petty offenses.

### B.    Little's Interpretation of § 3563(a)(3) Is Grammatically Incorrect, Divorced from Context, and Disregards § 3551(b).

According to *Little*, "'same' functions as an adjective," not a pronoun, and thus the "petty-offense clause" (i.e., "that is not a petty offense") extends to both "the same" and "a different offense." *Little* Op. at 8–10. *Little* reasoned that the "[t]he phrase . . . lacks obvious indicators that 'same' is functioning as a pronoun or that the backward reach of the petty-offense clause should be limited to only 'a different offense.'" *Id*. at 9.

*Little* does not acknowledge or address the most "obvious indicator[] that 'same' is functioning as a pronoun": grammatically, the use of the word "*that*" instead of "*which*" is both obvious and significant. "*That*" denotes a restrictive relative clause, rather than a nonrestrictive relative clause (signaled by "a comma plus *which*"). Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 142 & n.7 (2012).[3] Accordingly, "*that*" restricts "is not a petty offense" to "a different offense" such that the phrase "that is not a petty offense" modifies solely "a different offense"; it does not modify "the same."

Legislators "are presumed to be grammatical in their compositions" and "[g]rammatical usage is one of the means . . . by which the sense of a statute is conveyed[.]" *Id*. at 140–41. Had the drafters meant for "is not a petty offense" to apply to both "the same" and "a different offense,"

---

[3] For example, compare "Republicans oppose new taxes that are unnecessary. (Restrictive meaning: only unnecessary new taxes are anathema.)," with "Republicans oppose new taxes, which are unnecessary. (Nonrestrictive meaning: all new taxes are anathema.)." *Id*. (emphasis added). In subsection (a)(3), "that" provides a restrictive meaning.

the proper wording of subsection (a)(3) would have been: "the same or a different offense, *which* is not a petty offense." The drafters instead properly used "that" as a defining relative pronoun. *Id*. at 143.

The use of the disjunctive "or" in the statute ("the same *or* a different offense") "is also instructive" and indicates that the later modifying clause does *not* carry over to the term that precedes the disjunctive. *United States v. Nishiie*, 996 F.3d 1013, 1023 (9th Cir. 2021) ("As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately.") (quoting *Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975)).

*Little*'s reliance on a "lack[] [of] 'unexpected internal modifiers or structure'" and "[n]o comma separat[ing] the phrases 'the same' and 'or a different offense'" (*Little* Op. at 9) is unpersuasive. Section 3563(a)(3) "does not contain items that readers are used to seeing listed together or a concluding modifier that readers are accustomed to applying to each of them." *Lockhart v. United States*, 577 U.S. 347, 352 (2016). Readers are not accustomed to seeing "the same or a different offense" together because it is entirely redundant: "the same or a different offense" is simply "an offense" or "any offense."

Indeed, *Little*'s interpretation renders "the same or a different" in § 3561(a)(3) meaningless: to permit split sentences for any and all petty offenses, the drafters would have and could have said succinctly "*any* offense that is not a petty offense" as opposed to "*the same or a different* offense that is not a petty offense." The lack of a comma similarly cuts against *Little*'s interpretation and supports Mr. Kramer's position that the petty-offense modifying clause is restricted to "a different offense." *See supra* note 2.

*Little* disregarded that "'different offense' is set off by the word 'a'" as "grammatically necessary" but not indicative of a separation between "the same" and "a different." *Little* Op. at 9. The court failed to recognize that the word "a" can and does play both roles: while grammatically necessary, the insertion of the determiner "a" before "different offense" also cuts off the modifying phrase "that is not a petty offense" so that it does not reach backward to "the same."

12

The court also improperly rejected (*Little* Op. at 9–10) the "timeworn textual canon" of the "rule of the last antecedent." *Lockhart*, 577 U.S. at 351. Here, as in *Lockhart*, "the interpretation urged by the rule of the last antecedent is not overcome by other indicia of meaning. To the contrary § [3561(a)(3)]'s context fortifies the meaning that principle commands." *Id*. at 352. Reading the phrase "that is not a petty offense" to modify only "a different offense" is the grammatically correct reading of § 3561(a)(3), as well as the only reading that is consistent with the purpose of § 3561(a) and the entire sentencing scheme as a whole. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371 (1988); Scalia & Garner at 167 ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

Citing *Paroline v. United States*, 572 U.S. 434, 447 (2014), *Little* ultimately appears to resort to the "so-called series-qualifier canon," *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2448 (2021), to conclude that "the reach of the petty-of clause extends all the way to 'the same or a different offense,'" *Little* Op. at 12. "The series-qualifier canon gives way when it would yield a 'contextually implausible outcome.'" *Yellen*, 141 S. Ct. at 2448 (citation omitted) (rejecting D.C. Circuit's application of the series-qualifier canon and reversing *Confederated Tribes of the Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 22–23 (D.C. Cir. 2020)). In addition, the court in *Paroline* was interpreting a statute with six enumerated subprovisions, the last of which was a "catcall clause." *Id*. The court held that the "catchall" clause "is most naturally understood as a summary of the type of losses covered" in the prior five subprovisions. *Id*. Section 3561(a)(3) is not at all similar. *Paroline* thus provides no support for *Little*'s holding.

For "context," *Little* effectively looked solely at "the [petty-offense] phrase itself" in isolation. *Little* Op. at 9. While the court purported to look at the introductory language and each subsection of § 3561, *id*. at 9–10, the court failed to acknowledge that § 3561(b) operates on the whole as a limiting provision. The court also effectively ignored § 3551(b). The court did not

consider § 3551(b) to be part of the context in which § 3561(a)(3) must be interpreted and, instead, wrote it off as a provision that "ordinarily" but does not always apply.  *Id.* at 7.

The plain text of § 3551(b), entitled "Authorized sentences," authorizes only imprisonment "*or*" probation, not both.  Section 3551(b) lists in the disjunctive three different types of sentences—a term of probation, a fine, and a term of imprisonment—and then provides that "a sentence to pay a fine may be imposed in addition to any other sentence."  The fact that the statute specifies that only one type of sentence—a sentence to pay a fine—can be imposed in addition to a sentence of probation or a sentence of imprisonment underscores that the other two types of sentences—probation and imprisonment—are mutually exclusive.  The statute thus provides a court with the clear dichotomous choice between imposing a sentence of a term of imprisonment and imposing a sentence of a term of probation for "an offense," *i.e.*, any one single count of conviction.

*Little* also ignored the conflict between §§ 3561(a)(3) and 3551(b) that its interpretation creates, which even the government concedes exists under that interpretation.  *See United States v. Jeremiah Caplinger*, No. 21-cr-342 (PLF), Gov't Resp. to Suppl. Brs. at 4, ECF No. 56 (D.D.C. Mar. 9, 2022) (acknowledging "conflict between those provisions" but arguing conflict "is readily reconciled").  "There can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."  Scalia & Garner at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").  Under the correct interpretation of § 3561(a)(3), discussed above, there is no conflict.

### C. *Little*'s Interpretation of § 3563(a)(3) Makes No Sense in Context; The Correct Reading Does.

Under the plain text and grammatically correct reading of subsection (a)(3), a term of probation for an offense is not permitted if the defendant is sentenced in the same sentencing proceeding to a term of imprisonment for the same offense conviction, but a term of probation is permitted if the defendant is sentenced at the same sentencing proceeding to a term of imprisonment for a *separate* conviction that is a petty offense.  Contrary to *Little*'s assertion, "there

are [*particular*] circumstances in which Section 3561's narrow carveout for petty offenses would apply." *Little* Op. at 12–13, 15.[4]  Specifically, when a defendant is sentenced for two separate offenses of conviction at the same time, one of the two offenses is a petty offense, and the court imposes imprisonment for that petty offense, then the court can impose probation for the second offense.  In other words, befitting its status as a petty (*i.e.*, minor) offense, a court can impose imprisonment (a short term of 180 days or less) for a petty offense and impose probation (and no term of imprisonment) on a separate (petty or non-petty) offense of conviction.[5]  Where, as here, there is solely *one* petty offense conviction, a combined probationary and prison sentence is not statutorily authorized.

While the wording of the § 3561(a)(3) is perhaps inartful, when read correctly, the provision makes sense in the context of modern federal sentencing under the Sentencing Reform Act ("SRA").  The SRA eliminated "split sentences," abolished parole, and added the possibility of a term of supervised release imposed as part of a term of imprisonment.[6]  Probation and supervised release are separate and distinct forms of sentences.  Probation is an alternative to incarceration— imposed instead of and in lieu of a term of imprisonment.  By contrast, supervised release is part and parcel of a term of imprisonment.  Thus, the federal sentencing system was designed to prevent a defendant from being on probation and supervised release at the same time.  Because supervised release is not authorized for a petty offense, when a sentence of imprisonment

---

[4] By contrast, as discussed above, *Little*'s interpretation renders the phrase "the same or a different" meaningless and does not "give[] fully meaning and effect to all the words in § 3561(a)." *Little* Op. at 13, 15.

[5] By contrast, if the court imposes imprisonment for a non-petty offense, the court may not impose probation for the petty offense; the court must impose imprisonment for both offenses, and supervised release could follow for solely the non-petty offense. Similarly, if the court imposes probation for a petty offense, the court may not impose imprisonment for a non-petty offense; the court must impose probation for both offenses.

[6] *See* U.S.S.G. § 5B1.1(b)(3) & comment. (backg'd) (2018) (identifying § 3561(a)(3) as the provision that "effectively abolished the use of 'split sentences' imposable pursuant to the former 18 U.S.C. § 3651," but noting that "the drafters of the Sentencing Reform Act noted that the functional equivalent of the split sentence could be 'achieved by a more direct and logically consistent route' by providing that a defendant serve a term of imprisonment followed by a period of supervised release") (citing S. Rep. No. 225, 98th Cong., 1st Sess. 89 (1983)).

is imposed for a single petty offense, it is served and then it is done; no court supervision may follow. Only then, in that situation, (where the defendant is sentenced to a *short* term of imprisonment and no supervision of any kind may follow) is it possible for the court to subsequently supervise the defendant on a term of (either) probation or supervised release for a separate offense of conviction without timing and sentence calculation issues. *Cf.* 18 U.S.C. § 3564(a) ("A term of probation commences on the day that the sentence of probation is imposed, unless otherwise ordered by the court.").

Because the supervised release provision, 18 U.S.C. § 3583(a), expressly prohibits supervised release after imprisonment for a petty offense, *Little* suggests that "Section 3561 provides an alternative way for the Court in petty-offense cases to engage in 'postconfinement monitoring' after the defendant is released from imprisonment." *Little* Op. at 14–15. But nowhere did Congress express a goal of having every offender, regardless of his offense of conviction, on post-confinement monitoring. In fact, the supervised release statute expressly indicates Congress's goal was the opposite—to prohibit post-confinement monitoring of petty offenders. If Congress wanted to provide some degree of supervision for a person sentenced to incarceration for one single petty offense, it could have and would have amended § 3583(b)(3) by simply removing "(other than a petty offense)" to make supervised release available for all misdemeanors. Such an amendment to § 3583(b)(3) would have ensured the possibility of supervision for petty offenders without reinstating the possibility of a "split sentence," a mechanism that Congress so clearly and unambiguously abolished with the SRA. The fact that Congress did not do so evinces its intent.

Permitting both up to six months of incarceration plus up to five years of probation for one single petty offense makes no sense. A petty offense is, by nature, essentially the most minor type of charge brought in federal court. Thus, the government's view, which allows the possibility of

more punishment and a greater expenditure of resources for a petty offender than for a Class A misdemeanant, makes zero sense. [7]

The statute simply does not authorize a harsh increase in petty offense punishment.  If Congress had wanted to so drastically change the sentencing scheme for petty offenses, it would have done so in a far more explicit manner.  Probation as a sentence may be qualitatively less severe than imprisonment, but it still subjects offenders to "conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007).  It would be illogical to allow imprisonment and probation for the least serious offenses in the federal system.

### D.    "Common Usage" Is Inapplicable and Inapposite.

Citing arbitrary civil and regulatory statutes and random "other legal texts," *Little* relied on what it deemed to be "Congress's common usage of the phrase 'the same or a different' in other statutes" to support its conclusion, claiming that Congress "consistently uses 'the same' as an adjective modifying the noun following it." *Little* Op. at 10–11.  "Common usage" does not show "that 'same' is functioning as an adjective" in § 3561(a)(3).  *Id*. at 11.

As a threshold matter, "common usage" of a word or phrase is generally used in place of and as opposed to "some hidden technical meaning." *Inner City Broad. Corp. v. Sanders*, 733 F.2d 154, 158 (D.C. Cir. 1984).  The cases cited in *Little* discuss the common usage of the words "public" and "private." *Id*.; C*onsumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108–09 (1980).  "Common usage" of the phrase "the same or a different" is inapposite here because no party endorses some alternative "hidden technical meaning" of that phrase. Common

---

[7] Under the government's view, a defendant who committed one single petty offense could be punished with 6 months of imprisonment followed by five years of court supervision ("probation"); whereas, a defendant who committed a Class A misdemeanor, if sentenced to any amount of imprisonment at all, could be sentenced only to one year or less of court supervision ("supervised release").  Statutes should be construed to avoid such absurd results. *See, e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68–70 (1994); *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 453–455 (1989); *United States v. Turkette*, 452 U.S. 576, 580, (1981); *Holy Trinity Church v. United States*, 143 U.S. 457 (1892); *United States v. Kirby*, 74 U.S. 482 (1868).

usage does not tell a reader anything about the operation of "that is not a petty offense" in the provision.

Moreover, none of the random statutes and "other legal texts" *Little* cites contain the phrase "the same or a different" followed by a modifying clause beginning with the word "that," as in § 3561(a)(3). *See* Little Op. at 10–11 (citing various civil procedural laws, rules, and treatises). Because all are distinguishable in that key way, none supports *Little*'s holding. *Little* cites no other criminal statute using the phrase "the same or a different" and Mr. Kramer can locate none. Congress's use of the phrase is apparently exceedingly rare, not common.

### E.   Section 3561(a)(3) Does Not Provide "An Exception to § 3551's Default Rule."

*Little*'s reliance on § 3551(a) (*Little* Op. at 13–14) is misplaced.  Section 3551(a) provides that "[e]xcept as otherwise specifically provided, a person found guilty of an offense" must be sentenced "in accordance with the provisions of this chapter [chapter 227] so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent they are applicable in light of all the circumstances of the case."  It is undisputed here that Mr. Kramer must "be sentenced in accordance with the provisions of" chapter 227 to meet the purposes of sentencing listed in § 3553(a)(2)(A) through (D). Nothing "otherwise specifically provide[s]" that a defendant sentenced for violating 40 U.S.C. § 5104(d) should be sentenced pursuant to sentencing provisions of some other chapter "so as to achieve" some other purpose. Section 3561(a)(3) does not provide "otherwise," nor does it void or somehow override the unambiguous prohibition barring a sentence of both imprisonment and probation for "an" (*i.e.*, one single) "offense" in § 3551(b).

The "general/specific canon," Scalia & Garner at 183–184, also does not apply here. *Little* Op. at 14–15 & n.2.  That canon of construction applies only when there is a conflict between general and specific provisions, Scalia & Garner at 183–184, or "[w]here there is no clear intention otherwise," *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974); *see id.* at 551 ("When there are two acts upon the same subject, the rule is to give effect to both if possible…The intention of the

legislature to repeal must be clear and manifest.") (quotation marks and citation omitted).  Here, as discussed above, there is no conflict between §§ 3551(b) and 3561(a)(3) under the correct interpretation and Congress intent to prohibit split sentences is clear and manifest.

F.    *Little* **Failed to Consider the Legislative History and Constitutional Concerns.**

*Little* failed to consider the legislative history and constitutional concerns, both of which support Mr. Kramer's interpretation.

## V.  CONCLUSION

Based upon the above-stated factors, the Court should impose a sentence of 12 months' probation or 30 days home detention.  Such a sentence would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  May 9, 2022                    By  */s/ Jonathan K. Ogata*

JONATHAN K. OGATA
Deputy Federal Public Defender
(Bar No. 325914)
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
(E-Mail:  Jonathan_Ogata@fd.org)